**ALABAMA ELECTRIC COOPERATIVE, INC., et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Municipal Electric Utility Association of Alabama, et al., Alabama Power Company, Intervenors.**

No. 81–1797.

United States Court of Appeals, District of Columbia Circuit.

Argued 3 May 1982.

Decided 23 July 1982.

---

D. Biard MacGuineas, Washington, D. C., with whom Bennett Boskey, Washington, D. C., was on the brief, for petitioners.

Joel M. Cockrell, Atty., F.E.R.C., Washington, D. C., with whom Charles A. Moore, Gen. Counsel, and Barbara J. Weller, Deputy Sol., F.E.R.C., Washington, D. C., were on the brief, for respondent.

Arnold Fieldman, Washington, D. C., with whom Robert A. Buettner and Rodney O. Mundy, Birmingham, Ala., were on the joint brief for intervenors, Alabama Power Co. and Municipal Elec. Utility Ass'n of Alabama, et al.

Before MacKINNON and WILKEY, Circuit Judges, and GREENE,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

If the usual setting for an allegation of unlawful rate discrimination is a case where a utility applies different rates or charges to groups of customers which are claimed to be similarly situated, then this is the *unusual* case. We are called upon to determine whether an application of the *same* rate to two groups of customers which are similar in many respects may nevertheless violate statutory prohibitions against unduly discriminatory rate schemes. For reasons set out in detail below, we hold that it may. We also hold, in response to a second

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

question before us, that the petitioners raised their objections in a timely fashion before the Federal Energy Regulatory Commission (FERC), and that the issue of unlawful discrimination should have been resolved. We vacate FERC's approval of the subject rate filings and remand to the Commission for appropriate action.

## I. BACKGROUND

On 17 June 1974 Alabama Power Company filed with what was then the Federal Power Commission a proposed $12 million increase in its wholesale rates to rural electric distribution cooperatives (Cooperatives) and to municipal electric distribution systems (Municipalities). The proposed rates were such that, when applied to the test year data, they allowed "an overall rate of return of 8.72 and 8.89 percent, respectively, on the capital devoted to serving the Municipalities and Cooperatives." [1]

The proposed rates became effective, subject to refund, on 12 September 1974, and were referred to an administrative law judge for hearings on their reasonableness. On 30 April 1976 Alabama Power filed a superseding rate increase which, by Commission order,[2] became effective on 1 October 1976, also subject to refund. As a result of this subsequently-filed rate increase, the terms of which were the product of negotiations between the parties, the proceedings related to the June 1974 filing became restricted to an evaluation of the reasonableness of the rates which were in effect for a locked-in period from 12 September 1974 through 30 September 1976.

The ALJ's initial decision, rendered on 22 October 1976, called for revisions in Alabama Power's filings and held, meantime, that the proposed rates were *not* just and

reasonable.[3] This decision was modified on 1 August 1979 by FERC's Opinion No. 54, which disallowed the rate increase until Alabama Power filed a revised cost-of-service study and other "necessary amendments" to its rate schedule.[4] The Commission further clarified the determinations of Opinion No. 54 in an order issued 28 September 1979 and directed Alabama Power to submit compliance filings in accordance therewith.[5]

Alabama Power's 1 November 1979 filing of a revised cost-of-service study and amended rate schedules triggered protests from both the Cooperatives and the Municipalities, who claimed that the filing did not comply with the Commission's directives. The Cooperatives argued also that the company's revised schedules embodied rates which

> would have the effect of allocating improperly the responsibility for test year revenues between two wholesale groups. Indeed, ... application of such a single rate would result in the Cooperatives being required to pay approximately $361,000 more, and the Municipalities approximately $338,000 less, than the test year revenue for which each is responsible under Alabama Power's revised cost of service. Furthermore, this proposed single rate would have the effect ... of permitting the Company to collect approximately $23,000 more in test year revenue than it is entitled to collect under its own revised cost of service. Such results that would be obtained by application of this single rate to both wholesale groups is clearly unjust, unreasonable, and unduly discriminatory for the Cooperatives.[6]

The Commission noted numerous deficiencies in the compliance filing and encour-

---

1. Cover letter submitted to FERC with Alabama Power's 17 June 1974 rate filing, reprinted in Joint Appendix (J.A.) at 20–21.

2. Order issued 27 July 1976.

3. "Initial Decision of Administrative Law Judge on a Rate Increase Filing," *Alabama Power Co.*, Docket No. E–8851, 22 Oct. 1976, slip op. at 81, J.A. at 117.

4. Opinion No. 54, *Alabama Power Co.*, 18 FPS 5–692, 5–718 (1 Aug. 1979).

5. "Order Clarifying [Opinion No. 54] and Denying Applications for Rehearing," *Alabama Power Co.*, 19 FPS 5–266 (28 Sept. 1979).

6. "Intervenor Cooperatives' Protest of Alabama Power Company's Revised Cost of Service Study and Amended Rate Schedules," 27 Dec. 1979, J.A. 184, 185.

aged the company, intervenors, and Commission staff to meet informally to discuss the matter. Following the meeting, held in April 1980, the Cooperatives notified FERC that their contention that the overall rate structure, should be designed to produce revenues which matched, as closely as practical, the costs of service for each group—Cooperatives and Municipalities—remained unresolved. And when Alabama Power tendered another revised compliance filing on 8 January 1981, the Cooperatives once again objected, arguing that, while the figures were different, the revised schedule retained the fundamental defect to which the Cooperatives had objected earlier—a single rate yielding disparate overall rates of return on the costs to Alabama Power of providing service to the Municipalities and Cooperatives respectively. The Cooperatives indicated in their formal protest to the Commission that

> application of this proposed rate would result in the Cooperatives being required to pay approximately $173,000 more, and the Municipalities approximately $171,000 less, than the test year revenue for which each is responsible under Alabama Power's cost of service.... The results obtained by the application of this proposed rate to both wholesale groups is clearly unjust, unreasonable, and unduly discriminatory and causes substantial economic injury to the Cooperatives.[7]

The Municipalities protested the new compliance filings on other grounds, but opposed the Cooperatives' contentions.

FERC noticed the revised filing on 30 January 1981[8] and on 1 May 1981 issued a "By Direction" letter accepting the filing.[9] The Commission's letter did not address the merits of the Cooperatives' complaint, but stated only that "[b]ecause [Alabama Power] proposed a single wholesale rate applicable to both customer classes and the issue of separate rates for the two customer classes was not raised prior to the compliance date of this proceeding, Cooperatives' request for rate design revision is untimely and inappropriate."[10]

FERC denied rehearing on 29 June 1981 and the Cooperatives subsequently petitioned for this court's review.

## II. DISCUSSION

The opposing sides in this controversy do not actually meet head-on. The Cooperatives are firm in their contention that the rate accepted by FERC is unduly discriminatory. This particular argument is not directly countered on the merits, either by FERC or by the intervenors. These parties, for their part, have taken a procedural stance, casting the Cooperatives' position as a demand for separate rates and then insisting that the demand was simply made too late in the proceeding. Thus by these separate, in a sense converging, but not necessarily opposing arguments, we must address two principal issues: the first, whether the Cooperatives' objections were raised in a timely manner before the Commission; the second, whether there is a basis in law for the Cooperatives' argument that Alabama Power's revised rate schedule was unlawfully discriminatory. If the answer to both of these issues is in the affirmative, then we must conclude that FERC erred in failing to consider the objections raised. We shall address each in turn.

### A. The Nature and Timeliness of the Cooperatives' Objections.

FERC's position before this court is the same one taken in its denial of the petitioners' application for rehearing below—that because petitioners' objections to Alabama Power's revised rates did not relate specifically to the compliance of the company's filings with the Commission's directions in

---

7. "Intervenor Cooperatives' Protest of Alabama Power Company's Modifications to Revised Cost of Service and Amendments to Rate Schedules to Comply with the Direction of Opinion No. 54," 23 Jan. 1981, J.A. 232, 234–35.

8. 46 Fed.Reg. 10,980 (5 Feb. 1981).

9. Letter from FERC to Alabama Power Co., 1 May 1981, J.A. at 259 (a so-called "By Direction of the Commissioner Letter").

10. *Id.*

Opinion No. 54 and "could have been raised earlier," they were inappropriate to the compliance stage of the rate proceedings. The Commission points for support to *United States v. Tucker Truck Lines* [11] and related cases [12] for the proposition that "a reviewing court should not overturn an administrative decision unless the agency has erred in the face of objection made at the time appropriate under agency practice." [13] We do not question the accuracy of FERC's statement of this general rule. We simply cannot accept the Commission's insistence that the rule applies under the facts of this case.

First of all, FERC's contention depends strongly on its own insistence that the Cooperatives' protest against Alabama Power's compliance filing was (and is) simply a *demand for separate rates.*[14] We are not persuaded by this characterization of the petitioners' case.

It is clear from the record that the Cooperatives' objections to Alabama Power's rate schedule are *not* leveled at the company's application of a single rate, *per se*, but only at the fact that the *particular* single rate ultimately revised and filed in this case creates what the Cooperatives maintain to be an undue disparity between the rates of return to Alabama Power on its sales to the two groups of wholesale customers. Petitioners clearly articulated to FERC that they were not necessarily demanding a multiple rate schedule but simply a rate scheme which eliminated a "windfall" to the Municipalities at the expense of the Cooperatives: "So long as the necessary redesign of the

rate produces equitable results as between the Cooperatives and Municipalities, *it is immaterial whether there is a single wholesale rate or separate wholesale rates*—particularly since this case involves a locked-in period." [15] We do not see how this issue could have been raised before the Commission any earlier than it was.

The original rates proposed by Alabama Power in June 1974 called for rates of return from the Cooperatives and Municipalities of 8.89 percent and 8.72 percent, respectively. By all indications, the 0.17 percent difference between these two rates of return was considered by the parties to be a minor, unobjectionable disparity. Indeed, in his direct testimony at hearing, Alabama Power's B. J. Crawford indicated that it was *because* this disparity was only 0.17 percent that the company had made no attempt to establish separate rates for the two groups of wholesale customers. "The difference between these two rates of return figures," he testified, "does not warrant separate consideration for the two classes from a rate design standpoint and as a practical matter service to the two classes must be considered as essentially equivalent." [16]

As it turned out, however, the "practical matter" at the time of the June 1975 rate proposals was significantly altered when the rate filings were revised to "comply" with the Commission's subsequent directives. The 0.17 percent disparity of the original proposal broadened to one nearly three times as great—0.45 percent—in the

---

11. 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952).

12. *See, e.g., Magnesium Casting Co. v. NLRB,* 401 U.S. 137, 141–42, 91 S.Ct. 599, 601, 27 L.Ed.2d 735 (1971); *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251 (1941).

13. Brief for Respondent [hereinafter "FERC Brief"] at 14.

14. In the proceedings below, the Commission stated simply that "[b]ecause [Alabama Power] proposed a single wholesale rate applicable to both customer classes and the issue of separate rates for two customer classes was not raised prior to the compliance stage of the proceeding, Cooperatives' request for rate design revision is

untimely and inappropriate." By Direction Letter, *supra* note 9, J.A. at 259. It holds to this position before this court, urging that "the question of single or multiple rate schedules was an issue which Cooperatives could have raised at the hearing but did not." FERC Brief at 7.

15. "Intervenor Cooperatives' Opposition to Municipalities' Motion to Strike a Portion of Their Protest," 10 Jan. 1980, J.A. at 202 (emphasis added).

16. Prepared Direct Testimony of B. J. Crawford at 9, J.A. at 34.

rate schedule finally filed with the Commission. An unacceptable difference in the rates of returns was simply not an issue until late 1979 when Alabama Power first proposed a *new rate design* as part of its compliance filings.[17] The Cooperatives raised objection to the disparity effected by the revised rates as soon as the increased disparity appeared.[18]

The Commission argues further that, even if the petitioners' protest against the revised filings was triggered by the disparity in the rates of return, this disparity should have been *anticipated* and raised at the hearing stage of the proceedings. Such a contention stands the concept of timeliness on its head. It is one thing for the Commission to require that good faith objections to projected effects of an *existing* rate proposal be raised at a particular time in its proceedings. It is quite another to suggest that a protest be made on potential effects of *hypothetical alterations* to the existing proposal. Yet it is the latter and not the former requirement to which the Commission seeks to hold petitioners in this case.

There is no escaping the fact that, although the Cooperatives have anticipated that a disparity different from—even larger than—the 0.17 percent resulting from the original rates proposed by Alabama Power might result from any subsequent modifications to that single rate, a disparity as large as 0.45 percent was merely hypothetical at the time of the hearings on the

reasonableness of the then proposed rates. We cannot believe, as a practical matter, that FERC could have been expected to give proper consideration to a contention that a single rate yielding a 0.45 percent disparity would be unduly discriminatory when the rate before it at the hearing yielded a much smaller difference.

More important, perhaps, than our consideration of practicalities is that the Commission's contentions are blatantly inconsistent, not only with the position adopted in at least one earlier case, *Carolina Power and Light Co.*,[19] but with its overall statutory responsibility to administer the standards of the Federal Power Act, and to disapprove as unlawful any rate which is unduly discriminatory[20] or otherwise not "just and reasonable."[21]

In *Carolina Power*, as here, FERC was presented with a single rate design applicable to both cooperative and municipal groups of wholesale customers. In that case, as here, the original proposed rate schedule produced approximate, but not equal, rates of return from the two customer groups, and no challenge was made based on that disparity.[22] It was not until the compliance stage in *Carolina Power*, when a proffered compliance filing resulted in a 1.09 percent rate of return differential, that the issue of an unacceptable disparity was raised. The filing was rejected by the Commission in that case, as were the utility's contentions that the issues were not raised in a timely fashion.

---

**17.** There is simply no basis for the Commission's present contention that the Company's filings were limited to implementing the rates found reasonable in Opinion No. 54, *see* FERC Brief at 8. Alabama Power totally revised the rate design in its November 1979 filing. FERC's staff in fact criticized the Company at the time it filed the revised tariff for, among other things, failing to provide supporting data for the alterations in energy and demand charges. Letter from FERC to Alabama Power, 3 March 1980, J.A. at 213.

**18.** We find no basis in law or reason to hold that the petitioners are foreclosed from protesting the 0.45 percent disparity by their apparent decision not to object to the discrimination inherent in the 0.17 percent disparity worked by the original rate proposal. A person is not

to be prevented from objecting to being struck by a car simply because he raised no earlier objection to having been hit by a bicycle. The "car" by which the Cooperatives claim to have been hit did not exist prior to the compliance filings and the objection was not untimely for not having been raised before that time.

**19.** *Carolina Power & Light Co.*, Docket No. ER76–495, By Direction Letter, 2 Oct. 1979.

**20.** 16 U.S.C. § 824e(a) (1976).

**21.** *Id.* at 824d(a) (1976).

**22.** The original disparity in *Carolina Power* was 0.21 percent.

FERC now dismisses its approach in *Carolina Power* as aberrational—a departure from the established precedent of the "*Tucker Truck Lines* principle" that only timely objections must be considered.[23] Specifically, FERC intimates that the compliance filing in *Carolina Power* created a disparity in rates of return which was so great that it *could not have been anticipated and that the objections could not have been raised earlier.* The disparity in this case, it is argued on the other hand, was not so large as to excuse the Cooperatives' failure to anticipate it. FERC points also to the opinion underlying the compliance filing in *Carolina Power*, arguing that the Commission expressly left the door open in that case to issues which might arise in the compliance stage. According to the Commission, the absence of an equivalent allowance in Opinion No. 54 distinguishes this case from that one. We do not agree. We find little difference between the two cases.

The "permission" to which FERC refers in *Carolina Power* appears in its Opinion No. 19:[24]

> We leave the development of the actual compliance rates to [the utility], which must then submit the rates to the Commission for approval. If, on their examination, [any party] believes that a viable issue is present, it may submit supplemental briefs for our consideration, detailing its specific objections and the evidence and arguments in support.[25]

We simply are not convinced that this statement should be read as the express and limited permission FERC claims it to be. Rather than as support for a position that issues arising for the first time in the compliance stage cannot be brought to the Commission's attention unless the Commission has expressly left the door open for the parties to do so, the *Carolina Power's* pronouncement is, we think, more suitably styled as a restatement of a *general principle* that issues related to the conformity of a rate design with the applicable statutory standards may be raised properly within a reasonable time of whenever they present themselves. Such a reading is not only more in tune with the Commission's statutory responsibilities "to weigh discriminatory effects in rate proceedings"[26] but it also raises *Carolina Power* to a level entirely consistent with *Tucker Truck Lines* and other cases. It does not detract from the rule that arguments must be raised in a timely manner; it simply reaffirms the common sense that the timeliness of an objection, protest, complaint, or argument is to be judged, not in terms of what stages of the administrative process may have passed, but *when* the issues themselves arise and call for a decision.

■ Against this standard it is difficult to see how the Cooperatives' objections at issue here could have been made before the Commission any earlier than they were. We therefore hold that FERC erred in dismissing the petitioners' arguments as untimely and refusing to consider the argument of undue discrimination on the merits. The Commission's duty to do so on remand brings us to the second aspect of our discussion.

## B. *The Issue of Discrimination.*

The statutory standards relevant to the issues in this case are clearly set forth in

---

23. FERC Brief at 18.

24. *Carolina Power & Light Co.*, 15 FPS 5–619 (2 Aug. 1978).

25. *Id.* at 5–634.

26. *Conway Corp. v. FPC*, 510 F.2d 1264, 1270 (D.C.Cir.1975), *aff'd*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). This responsibility goes hand in hand with the Commission's overall duty under the Power Act to protect consumers from excessive rates and charges, and therefore to declare as "unlawful" any rate or charge that is not "just and reasonable." As this court has observed, it is "[t]o effectuate this purpose [that] the FPC is empowered, either upon complaint or on its own initiative, to enter upon an investigation concerning the lawfulness of a rate in a newly filed schedule." *Municipal Light Boards v. FPC*, 450 F.2d 1341, 1348 (D.C.Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

the Federal Power Act. Section 205[27] provides in relevant part as follows:

(a) All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, . . . and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) No public utility shall, with respect to [such] (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

While neither statutes nor decisions of this court require that the Commission utilize a particular formula or a combination of formulae to determine whether rates are just and reasonable,[28] it has come to be well established that electrical rates should be based on the costs of providing service to the utility's customers, plus a just and fair return on equity. FERC itself has stated that "[i]t has been this Commission's long standing policy that rates must be cost supported. Properly designed rates should produce revenues from each class of customers *which match, as closely as practicable, the costs to serve each class or individual customer.*"[29]

■ Ratemaking is, of course, much less a science than an art. Cost itself is an inexact standard[30] and may, in a particular set of circumstances, serve as the basis for several different rates. It is for this reason, if for no other, that great deference is given to FERC's expertise and judgment on the reasonableness of a particular rate proposal—and courts will not be so presumptuous as to hold unlawful a rate approved by the Commission if, even if not in the court's judgment the "ideal" design, it is nevertheless within a "zone of reasonableness."[31]

But FERC's responsibility under the Federal Power Act does not end with a determination that a proposed rate is reasonable, for it may be unlawful on other grounds. As the Supreme Court established long ago, "rates may lie within the zone of reasonableness and yet result in undue prejudice,"[32] unlawful under section 205(b).

■ While the typical complaint of unlawful rate discrimination is leveled at a rate design which assigns different rates to customer classes which are similarly situated, a single rate design may also be unlawfully discriminatory. Such would be the case where, as is alleged here, a uniform rate creates an undue disparity between the rates of return on sales to different groups of customers. It matters little that the affected customer groups may be in most respects similarly situated—that is, that they may require similar types of service at similar (even if varying) voltage levels. If the costs of providing service to one group are different from the costs of serving the other, the two groups are in one important respect quite dissimilar. And, as several commentators have noted, "charging the

---

27. 16 U.S.C. § 824d (1976).

28. We may require only that the rates fall within a "zone of reasonableness." *See* p. 27 *infra.*

29. *Carolina Power & Light Co.,* Docket No. ER76–495, By Direction Letter, 2 Oct. 1979.

30. No cost of service study—a compilation endeavoring to allocate to the various categories of service the costs of supplying such service—can be precise and factual. Rather than demonstrating with precision the revenue requirements to be assigned to each class of service, it simply reflects the opinion and approach of the individual making it. Thus, it can never be

more than an aid to judgment in the design of a structure that will be fair and reasonable to all categories of customers.

31. *FERC v. Pennzoil Producing Co.,* 439 U.S. 508, 517, 99 S.Ct. 765, 771, 58 L.Ed.2d 773 (1979); *Permian Basin Area Rate Cases,* 390 U.S. 747, 797, 88 S.Ct. 1344, 1375, 20 L.Ed.2d 312 (1968); *National Ass'n of Broadcasters v. Copyright Royalty Tribunal,* 675 F.2d 367, 368, 374 (D.C.Cir.1982).

32. *United States v. Illinois Central R. R.,* 263 U.S. 515, 524, 44 S.Ct. 189, 193, 68 L.Ed. 417 (1924).

same price to two purchasers where the seller's costs with respect to each differ must ... be considered discrimination," [33] just as charging different prices where the seller's costs are the same.

There is no question against this principle that a rate design yielding a 0.45 percent difference in cost-justified rates of return is discriminatory. This would have been so for that matter of Alabama Power's original proposed rate, which offered only a 0.17 percent disparity. Both have the effect of imposing on one group—the Cooperatives—charges which are higher than necessary to recover the costs of servicing that group plus the authorized overall return on capital, while permitting the Municipalities to pay a lower amount relative to service costs. By the Cooperatives' calculations, unchallenged by the other parties, application of the rate at issue here results in revenues from the Cooperatives of about $173,000 more and from the Municipalities about $171,000 *less* than the revenue for which each is responsible under Alabama's revised cost of service, as set out in the margin.[34]

We do not intimate that any such discrimination *necessarily* renders the underlying rate unlawful. We recognize that, even under a purely cost-based rate scheme, absolute equivalence of overall rates of return among similar customer groups is little more than an ideal. It would no doubt be impossible, even if desirable, to formulate a rate scheme with such precision that each customer—or even customer group—is made to bear the exact cost of the service he received.[35] Furthermore, Congress, through section 205(b), has not required absolute uniformity. The section proscribes only "any *unreasonable* difference in rates" and "any *undue* preference or advantage." [36]

But even if we cannot at this point hold that the discrimination at issue here is *per se* unreasonable, neither can we say, as a matter of law, that the disparity is so small as to be *per se* reasonable. Translated into dollars, it is not insignificant.[37] Although absolute equivalence of the overall rates of return yielded on revenues from customers or customer groups under a specific rate scheme may not be achievable in every case,[38] it remains the standard. Any return

33. Dam, *The Economics and Law of Price Discrimination*, 31 U.Chi.L.Rev. 1, 6 (1963). *See also* J. Bonbright, Principles of Pubic Utility Rates, 374 (1961); Hale, *Commissions, Rates, and Policies*, 53 Harv.L.Rev. 1103, 1105 (1940). This principle has been recognized by this court on at least one occasion. *See Payne v. Washington Metro. Area Transit Comm'n*, 415 F.2d 901, 915–16 n.71 (D.C.Cir.1968).

34.

|  | Cooperatives | Municipalities |
|---|---|---|
| Cost of Service Revenue (*including* the 9.09% rate of return authorized) | $12,194,431 | $19,507,888 |
| Revenue under Revised Rate | 12,367,452 | 19,337,177 |
| Differential | $ 173,021 | ($ 170,711) |

The overall rates of return to Alabama Power, by this calculation, are 9.37 percent from the Cooperatives and 8.92 percent from the Municipalities.

35. *See* J. Bonbright, *supra* note 33, at 296–97.

36. 16 U.S.C. § 824d(b) (1976) (emphasis added).

37. The disparity is in fact only slightly smaller than the difference between the overall rate of return which Alabama Power originally sought (9.2%) and the rate of return to which the intervening customers claimed the company was entitled (8.57%). As the ALJ observed in the Initial Decision, "[t]hese differences seem not to be great, but translated into dollars, they are very significant and require a careful examination." J.A. at 85. The dollar amount with which the petitioners confronted the Commission in January 1981 was $576,000—an amount representing $346,000 in "overpayments" during the locked-in period, plus interest on that amount to 1 January 1981. J.A. 234–35. This is indeed a significant amount.

38. We have no doubt that there is a degree of disparity in rates of return under a uniformly-applied tariff within which the billing costs involved in attempting to conform charges to customer costs become so great as to outweigh the economic advantages which certain customers might enjoy if discrimination were completely eliminated. Such a difference would not justify invalidating a rate as unlawfully discriminatory. The discrimination is, in effect, reasonable under those circumstances.

disparity created by a rate scheme must therefore be as close to zero as the circumstances permit. This is simply a logical element of the standard for the overall reasonableness of a rate scheme—that it "should produce revenues from each class of customers which match, as closely as practicable, the costs to serve each class or individual customer." [39]

There can be no doubt that the Cooperatives' objections to the single rate schedule proposed by Alabama Power raised cognizable issues concerning the rate's discriminatory effects. However, we are not, at least for the moment, the appropriate body to rule on the issues. Congress delegated to FERC, and not to the courts, the first-round responsibility to determine whether an identified discrimination in a rate design is "undue" and therefore unlawful. FERC erred in refusing to fulfill that responsibility when timely objection was made, and it is for the purposes of giving it a chance to fully consider the Cooperatives' objections that we must remand this case. The Commission may find it appropriate under the circumstances to permit supplemental briefs or other appropriate submissions on the issue. The Cooperatives have, after all, pointed to the discriminatory nature of the rate structure. It will be for Alabama Power to demonstrate that this discrimination is not "undue," and it should in all fairness be allowed the opportunity to do so.

■ This will be no facile task, we are sure. In the typical case, where the section 205(b) challenge is raised against a rate design calling for different rates to customer classes which are similarly situated, the utility has the burden of satisfying FERC that such differences exist between the classes as to justify the separate rates. Only if the utility fails to carry this burden will the rate be found to be unduly discriminatory and unlawful. [40] The burden is not changed simply because a single and not a multiple rate schedule is at issue. So it must be that when a purportedly cost-justified tariff is challenged because it yields disparate overall rates of return on the service to various customer groups, the utility must demonstrate to the Commission's satisfaction that the discriminatory effects are not unreasonable. It might do so by offering a valid reason for the disparity or by demonstrating that the gap is as small as practicable under the circumstances. Regardless of the methods or arguments employed, if attempts at justifying the rate fail, the rate must be held to be unlawful until it is restructured to eliminate the disparity, or at least to reduce it to acceptable levels.

FERC may, in such a case, permit the utility to correct the deficiencies, or it may itself fix the rate to be applied to the locked-in period. The Commission's responsibility to undertake the task of overseeing the design of an appropriate, non-discriminatory rate is outlined under section 206(a) of the Federal Power Act:

> Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate ... demanded ... by any public utility for any transmission or sale subject to the jurisdiction of the Commission ... is unjust, unreasonable, unduly discriminatory or preferential, the Commission *shall determine the just and reasonable rate ... to be thereafter observed and in force, and shall fix the same by order.*[41]

The Commission's power to establish or require a new rate is not limited to a particular rate structure. Thus, even though Alabama Power's proposed tariff calls for a single rate, a separate rate structure for the Municipalities and Cooperatives for the locked-in period is not out of the question. If, upon consideration of the arguments made by the respective parties, the Commission determines that a reduction in the

---

**39.** *Carolina Power & Light Co.*, Docket No. ER76–495, By Direction Letter, 2 Oct. 1979.

**40.** *See Wisconsin Michigan Power Co.*, 31 F.P.C. 1445, 1459 (1964).

**41.** 16 U.S.C. § 824e(a) (1976) (emphasis added).

demonstrated disparity between the rates of return from the Cooperatives and the Municipalities is necessary but that it cannot be achieved under a uniform rate, it should accept this as an indication that the two wholesale groups be treated as different customer classes for ratemaking purposes.

We do not imply that a single rate may not be found to be appropriate. But the Commission must not close the door at this point to the possibility that separate rates may be required. It is not, as FERC has intimated, that "the record is utterly devoid of evidence to support designing separate rates for cooperatives and municipals." [42] At a minimum, there is evidence of a discriminatory disparity of 0.45 percent in the rates of return. If this discrimination is undue and cannot be remedied by a single rate design, then its existence alone may be sufficient to justify the development of separate rates for the two groups. But this issue, just as the issue of discrimination itself, is a matter properly committed to the Commission on remand. It is not fair game for this court at this time.

### III. CONCLUSION

Contentions by FERC, joined by the Municipalities and Alabama Power, that this rate proceeding has languished for an excessive period to this point are no doubt well taken. But the difficulties and delays encountered in attempts to arrive at an acceptable rate scheme offer no justification for FERC to perform any less than its full regulatory responsibility under the Federal Power Act. We do not know if the Commission actually misunderstood the nature and intent of the Cooperatives' objec-

tions or if it was simply unwilling to prolong the proceeding—as proper consideration of the protests might require. In either case, the disposal of the objections by a simple assertion that they are not raised in a timely manner is unacceptable. Objections were raised in a timely manner—when the issues presented themselves.

Furthermore, although overshadowed perhaps by energetic objections to other aspects of Alabama Power's proposed rates, the position that Alabama Power should receive the same rate of return with respect to services to the Cooperatives as it did with respect to services to Municipalities was consistently maintained throughout the proceedings. This position is correct as a matter of principle, and FERC was under a statutory duty to evaluate that aspect of the proposed rates in its overall examination of their qualification against the standards set by the Federal Power Act.

We made no finding as to what is an undue disparity. We point only to the requirement that Alabama Power be required to justify the disparity or, absent such justification, that the disparity be reduced, by whatever method or designs may be necessary or appropriate. It is so ordered.

*Vacated and remanded.*

---

**42.** FERC Brief at 25. The Cooperatives in fact suggested, in their protest of Alabama Power's 8 January 1981 compliance filing, that the use of a slightly different demand charge for each of the two wholesale customer groups would produce rates which would achieve revenues from each group equal to the revenue requirements to which the Company was entitled, according to its own cost of service filing. This would equalize the rates of return realized by Alabama Power on the revenues from each group, therefore eliminating the overcollection from the Cooperatives and the undercollection from the Municipalities. J.A. at 235–36, 242–45. The suggestion was, of course, labeled by the Commission as an untimely demand for separate rates and dismissed without further consideration of its message—that a rate schedule could be developed which conformed to the Commission's Opinion No. 54 and which yielded revenues from the wholesale customer groups which approximated those authorized to meet the costs of service to each.