**NEVADA POWER COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

Nos. 76–3298, 77–3296 and 77–3297.

United States Court of Appeals,
Ninth Circuit.

Jan. 17, 1979.

Reuben Goldberg (argued), of Goldberg, Fieldman & Letham, P.C., Washington, D.C., for petitioner.

Joseph G. Stiles (argued), James D. O'Brien (argued), of Lund, Levin & O'Brien, Washington, D.C., for respondent.

On Petition to Review a Decision of The Federal Power Commission.

Before BROWNING and CHOY, Circuit Judges, and CHRISTENSEN,* District Judge.

CHOY, Circuit Judge:

Nevada Power Company (Nevada Power) seeks review of three orders of the Federal Energy Regulatory Commission [1] regarding proposed rate increases. We affirm.

## I. Statement of Facts

Nevada Power sells electric power and energy to California-Pacific Utilities Company (Cal-Pac) for resale at Henderson, Nevada, and Needles, California.[2] The Commission regulates such sales under the Federal Power Act (FPA), 16 U.S.C. § 791a. Nevada Power's sales to Cal-Pac constitute about 2 to 3% of Nevada Power's total electric sales. The remaining sales consist of retail service within Nevada and are subject to regulation by the Nevada Public Service Commission, an agency of the State of Nevada. In 1974 and 1975 Nevada Power made three requests for rate increases which led to the instant appeals.

### A. No. 76–3298

In April of 1974, Nevada Power applied to the Commission for an increase in rates and charges to Cal-Pac in the annual amount of $445,000. Nevada Power proposed that the increase be effective from June 1, 1974. The Commission accepted for filing Nevada Power's proposed rate increase, suspending its effective date for five months (the maximum period allowed by the FPA), after which time the rate went into effect subject to refund. The Commission also set the matter for hearing before an Administrative Law Judge (ALJ).

The ALJ approved only part of Nevada Power's proposed increase. Upon appeal by Nevada Power, the Commission affirmed the ALJ's decision, except for allowing Nevada Power a 14% rate of return on common equity rather than the 13.5% approved by the ALJ. The Commission thus ordered Nevada Power to reduce its rate increase and to make refunds with interest for the "locked in" period during which Nevada Power had charged its proposed rates. The Commission later denied Nevada Power's application for rehearing and stay.

### B. No. 77–3297

Later in 1974, Nevada Power applied to the Commission for a second increase in rates and charges to Cal-Pac in the annual amount of $998,486. The Commission accepted for filing Nevada Power's proposed increases, suspending the effective date for five months, after which time the rates went into effect subject to refund.

After hearings, an ALJ disallowed Nevada Power's proposed rate increase, finding it unjust and unreasonable. The Commission affirmed the decision of the ALJ except for allowing Nevada Power to amor-

---

* The Honorable A. Sherman Christensen, Senior United States District Judge for the District of Utah, sitting by designation.

1. On October 1, 1977, the Federal Energy Regulatory Commission succeeded to some of the functions of the Federal Power Commission, which originally dealt with Nevada Power's requests. See 42 U.S.C. § 7172(a). For our pur-

poses we need not distinguish between the two Commissions.

2. Nevada Power's sales to Cal-Pac at Laughlin, Nevada, provide power for Searchlight, Nevada, as well as Needles, California. References to Needles include the Searchlight power.

tize its regulatory expenses over two years rather than the one year period proposed by the ALJ. The Commission thus disallowed Nevada Power's proposed rate increase, and ordered refunds with interest for the "locked in" period. The Commission again denied Nevada Power's application for rehearing and stay.

### C. No. 77–3296

In 1975, Nevada Power applied to the Commission for a third time, proposing an increase in rates and charges to Cal-Pac in the annual amount of $330,000. The Commission accepted for filing Nevada Power's proposed increase, suspending the effective date for five months, after which time the rates went into effect subject to refund.

Again an ALJ disallowed Nevada Power's proposed rate increase as unjust and unreasonable. The Commission affirmed the decision of the ALJ in all respects. The Commission thus disallowed Nevada Power's proposed rate increase and ordered refunds with interest for the "locked in" period. Again the Commission denied Nevada Power's application for rehearing and stay.

### II. Nevada Power's Claims

In contesting the Commission's rate determinations, Nevada Power challenges as improper (A) the methodolgy used by the Commission in determining the cost of power supplied to Cal-Pac by Nevada Power; (B) the allocation of demand costs between jurisdictional sales (those subject to the Commission's jurisdiction) and nonjurisdictional sales (those subject to the jurisdiction of the Nevada Public Service Commission); (C) the rate of return allowed on Nevada Power's common equity; (D) the assignment of costs associated with facilities used to serve Cal-Pac; and (E) compensation for wheeling services provided to Cal-Pac by Nevada Power.

A. Nevada Power based its computation of the cost of electric energy sold to Cal-Pac solely on Nevada Power's cost of production of steam-generated electrical energy. Claiming that legal restrictions prevented it from selling hydroelectric power to Cal-Pac, Nevada Power did not consider the lower cost of hydroelectric power in calculating power supply costs to Cal-Pac. The Commission, however, in accordance with its standard practice, determined that the costs of all of Nevada Power's sources of supply—steam and hydroelectric—should be averaged ("rolled-in") in computing the cost of energy supplied to Cal-Pac by Nevada Power. Nevada Power claims that the effect of the Commission's rolling-in is to understate the cost of supplying energy to Cal-Pac and to deprive Nevada Power's retail customers of the lower cost of the hydroelectric energy they receive.

B. In allocating demand costs [3] between jurisdictional and nonjurisdictional sales, Nevada Power employed a peak responsibility method of calculation, based on the average of the coincident peaks of five working days of the peak week during the test period.[4] The Commission instead adopted a method based on the average of twelve

---

**3.** The demand costs of an electric utility are its costs associated with the utility's investment in the plant needed to meet the demands placed upon it and those operational costs that do not vary with changes in the operation of the utilization of the plant.

**4.** In its brief, Nevada Power explains that a peak responsibility method

allocates demand costs based on the responsibility of the customer, here Cal-Pac, for facilities constructed or capacity provided to meet the maximum requirements of the Nevada system. Under the peak responsibility method, demand allocation factors are developed on the basis of the ratio that Cal-Pac's maximum demands upon Nevada's system at the time of Nevada's system peak bears to

Nevada's total system peak, thereby giving Cal-Pac the entire benefit of any diversity in demand that may exist between its peak demand on Nevada's system and whatever Cal-Pac's demand on Nevada's system may be at the time of Nevada's system peak. In order to eliminate any possibility of abnormality in the determination of Cal-Pac's responsibility for the peak demand on Nevada's system, Nevada derived its demand cost allocation factor by averaging the results of Cal-Pac's responsibility for Nevada's system peak in five different days during the peak week on Nevada's system . . . rather than to rely on a single annual peak responsibility determination.

monthly coincident peaks. The Commission found it necessary to consider not only installed generation capacity, as contended by Nevada Power, but also maintenance and overhaul schedules, unscheduled and scheduled outages, diversity interchanges of capacity, and reliance upon interconnection for reserve capacity. Nevada Power claims that the adoption of the Commission's methodology had the effect of denying Nevada Power recovery of a substantial portion of the demand costs it incurred to render service to Cal-Pac. Nevada Power argues, *inter alia,* that since the ratio of the average of Nevada Power's monthly peaks to its annual peak is greater than the ratio of the average of Cal-Pac's demands at Nevada Power's monthly peaks to its highest demand at such a peak, Cal-Pac received an undue discount.

C. Nevada Power requested that it be permitted a 21.4% rate of return on common equity. The Commission allowed a 14% rate of return, noting that an allowed rate must be both commensurate with return on investments in other enterprises having a corresponding degree of risk and sufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and attract capital. The Commission noted:

> A fair rate of return for a public utility is not a matter which is to be determined by the mechanical application of a mathematical formula, but rather such a determination requires the exercise of informed judgment based upon an evaluation of the particular facts presented in each proceeding. There is no one precise answer to the question of what constitutes a proper rate of return. Rather, there is a zone of reasonableness within which the Commission is free to fix a rate of return. The interests of the company are to be considered along with those of the wholesale customers and the ultimate consumers, all to the end of assuring adequate service to the public and the financial integrity of the utility involved.

*Nevada Power Co.,* 10 F.P.S. 5–211, 5–220 (1976). Nevada Power contends that the Commission's allowance of 14% is confiscatory, unreasonable, and therefore illegal.

D. Nevada Power assigned the capital and operating costs of its Mohave substation to the cost of service for Cal-Pac. Nevada Power claimed that since the Mohave substation is used exclusively for Cal-Pac's service, the costs associated with such service should be borne solely by Cal-Pac. The Commission, however, reasoned that since Nevada Power operates an integrated transmission system that serves all customers, such transmission costs should be rolled-in with all other system-wide costs and then allocated to jurisdictional and nonjurisdictional service on the basis of demand cost allocation factors. The Commission also found that Nevada Power had contracted to install the Mohave substation at its own expense. Nevada Power claims that the Commission incorrectly interpreted the Nevada Power-Cal-Pac agreement.

E. Nevada Power requested compensation for providing transmission (wheeling) services to Cal-Pac for purchases of energy by Cal-Pac from the United States Bureau of Reclamation. The Commission, however, contrary to Nevada Power's interpretation, found that Nevada Power had contracted with Cal-Pac to wheel such power at no cost to Cal-Pac, and therefore disallowed compensation. The Commission also determined that a wheeling charge was unwarranted because Nevada Power avoided the expense of having to transmit its own power from the Mohave plant to the Mead substation. The Commission concluded lastly that Nevada Power did not meet its burden of proving the propriety of the charge.

III. *Standard of Review*

■ The FPA provides a very limited role for judicial review. The Supreme Court has written:

> [T]he breadth and complexity of the Commission's responsibilities demand that it be given every reasonable opportunity to formulate methods of regulation appropriate for the solution of its intensely practical difficulties. This Court has

therefore repeatedly stated that the Commission's orders may not be overturned if they produce "no arbitrary result." . . .

. . . .

. . . [T]he responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests . . . . The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

*Permian Basin Area Rate Cases,* 390 U.S. 747, 790–92, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968). The court must act guardedly in reviewing whether the Commission properly considered the pertinent factors:

It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order

does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that is invalid because it is unjust and unreasonable in its consequences.

*FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944).[5] Moreover, the FPA requires that "to the extent that the findings of the Commission are 'supported by substantial evidence, [they are] conclusive.'" *Washington Department of Game v. FPC,* 207 F.2d 391, 397 (9th Cir. 1953), *cert. denied,* 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087 (1954); *see* FPA § 313(b), 16 U.S.C. § 825*l*(b). In short, the courts have an "essentially narrow and circumscribed" role in reviewing rate orders. *Permian Basin Area Rate Cases,* 390 U.S. at 766, 88 S.Ct. 1344; *see FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); *Dorchester Gas Producing Co. v. Federal Energy Regulatory Commission,* 571 F.2d 823, 831 (5th Cir. 1978); *Kansas-Nebraska Natural Gas Co. v. FPC,* 534 F.2d 227, 230 (10th Cir. 1976); *Consolidated Gas Supply Corp. v. FPC,* 172 U.S.App.D.C. 162, 170–71, 520 F.2d 1176, 1184–85 (1975); *Washington Department of Game,* 207 F.2d at 397.

As the statement of the issues indicates,[6] appellants have raised numerous intricate and detailed contentions within the special competence of the Commission.[7] We must therefore be particularly reluctant to substitute our balancing of interests for that of the Commission. *See Permian Basin Area Rate Cases,* 390 U.S. at 790, 88 S.Ct. 1344; *Hope Natural Gas Co.,* 320 U.S. at 602, 64 S.Ct. 281; *Dorchester Gas Producing Co.,* 571 F.2d at 831.

---

5. The District of Columbia Circuit has noted: "Supreme Court precedents under the Natural Gas Act are plainly applicable to the Federal Power Act, involved in the case at bar." *Mun. Light Bds. v. FPC,* 146 U.S.App.D.C. 294, 300, 450 F.2d 1341, 1347 (1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972); *see United Gas Pipe Line Co. v. Mobile Gas*

*Serv. Corp.,* 350 U.S. 332, 346, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

6. *See* part II *supra.*

7. The Administrative Law Judge wrote: "This case is a rather typical modern-day electric utility rate case."

■ Cognizant of our limited role in reviewing the Commission, the Commission's special expertise in these matters, and the Commission's extensive proceedings on these issues, we have carefully reviewed the record in this case. We find that the Commission (with one exception discussed below) has given reasoned consideration to all pertinent factors, has acted within its discretion and authority, and has reached a just and reasonable result supported by substantial evidence. Accordingly, the Commission's results are conclusive. *Washington Department of Game,* 207 F.2d at 397; *see Norwood v. FPC,* 178 U.S.App.D.C. 270, 271, 546 F.2d 1036, 1037 (1976).

Although we are most reluctant to interfere with the complex and specialized task confronting the Commission, we find that the Commission on one issue has arguably reached an improper legal conclusion, a matter not within the Commission's unique expertise. In refusing Nevada Power's request for a wheeling charge, the Commission accepted the ALJ's finding that Nevada Power had agreed to wheel power for Cal-Pac at no charge. In 1958 Cal-Pac and Nevada Power had contracted for wheeling at a given charge. In 1967 they agreed that if Cal-Pac made certain changes in its capacity to transmit power, "Nevada Power is agreeable to the wheeling . . . at no additional cost to California-Pacific." [8] In consonance with the ALJ's initial decision, the Commission interpreted this last clause as meaning that Cal-Pac would not be charged at all for wheeling.

■ Were it necessary for us to interpret this contract, we would probably agree with Nevada Power that the more reasonable interpretation is that Cal-Pac could change

its transmission system and still receive wheeling at the 1958 rate. Under the circumstances, however, we find it unnecessary to resolve this issue.[9] The Commission also affirmed the rejection of the wheeling charge by the ALJ on the grounds that the 1967 arrangement resulted in lower costs to Nevada Power, thereby warranting disallowance of the charge, and that Nevada Power had failed to sustain its burden of proving the reasonableness of applying a wheeling charge. These last two points involve complex and intricate questions suited to the Commission's expertise. Mindful of the limited role of judicial review, we find that the record indicates that the Commission has given reasoned consideration to all pertinent factors involved in these issues, has acted within its discretion and authority, and has reached a just and reasonable result supported by substantial evidence.[10] Accordingly, we must affirm the Commission's decision. *See Hope Natural Gas Co.,* 320 U.S. at 602, 64 S.Ct. 281; *Washington Department of Game,* 207 F.2d at 397.

AFFIRMED.

---

8. The relevant part of the letter read:

   If California-Pacific makes the necessary arrangements with the United States Bureau of Reclamation to include the Mead bus as a delivery point for purchases of firm power and energy from the Bureau, Nevada Power is agreeable to the wheeling of this power and energy to the terminals of Nevada Power's 69–Kv oil circuit breaker to be installed at the Mojave Project *at no additional cost* to California-Pacific.
   (Emphasis added.)

9. Given our conclusion, we need not consider the appellee's contentions regarding the proper level of judicial deference to the Commission's legal conclusions.

10. We do not suggest that we would necessarily have balanced the interests in the same manner as did the Commission on any or all of these two contentions. That, however, is not our function. *See Permian Basin Area Rate Cases,* 390 U.S. 747, 791, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); part I *supra.*