765 F.2d 1434
 CITIES OF RIVERSIDE AND COLTON, CALIFORNIA, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
and
Cities of Vernon and Anaheim, and Southern California Edison
Company, Intervenors.
 Nos. 84-7184, 84-7220 and 84-7576.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1985.
Decided July 18, 1985.
 
 Duncan, Allen & Mitchell, Donald R. Allen, David P. Yaffe, Richard M. Gittleman, Washington, D.C., for Riverside and Colton, Cal.
 Joseph S. Davis, William H. Satterfield, Gen. Counsel, Barbara J. Weller, Deputy Sol., Joel M. Cockrell, Washington, D.C., for F.E.R.C.
 David B. Brearley, El Monte, Cal., Arnold Fieldman, Goldberg, Fieldman, & Letham, P.C., Washington, D.C., for intervenor City of Vernon.
 Wallace L. Duncan, James D. Pembroke, John W. Griggs, Charles F. Holum, Duncan, Weinberg & Miller, P.C., Washington, D.C., for Anaheim, Cal.
 Petition for Review of the Decision of the Federal Energy Regulatory Commission.
 Before KENNEDY, HUG and FERGUSON, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 The cities of Riverside and Colton, California (the "Cities") appeal from a Federal Energy Regulatory Commission (the "Commission") order approving Southern California Edison Company's ("Edison") multi-class rate design.
 
 
 2
 The Cities, which are wholesale customers of Edison and intervenors in Edison's rate increase proceedings before the Commission, do not challenge the rate of return on common equity or the overall return on rate base approved by the Commission as a part of Edison's cost of providing service to its wholesale customers. Rather, the Cities argue that the multi-class rate design approved by the Commission is arbitrary and capricious because the Commission purportedly departed from previously established standards applied in determining whether a single-class rate design is appropriate and failed to explain adequately its rationale for approving a multi-class rate design. The Cities also contend that the Commission's order is not justified by substantial evidence. We affirm.
 
 FACTS
 
 3
 On January 15, 1979, Edison filed with the Commission a proposed rate increase pursuant to Section 205 of the Federal Power Act, 16 U.S.C. Sec. 824d (1982) (the "Act"), seeking to increase the rates charged to nine of its wholesale customers. Under its proposed rate increase, Edison's wholesale customers were given the option of being served under Rate Schedule R ("Resale") or Rate Schedule TOU-R ("Time of Use-Resale").-- Customers would be automatically served under Rate Schedule R unless they elected to be served under Rate Schedule TOU-R. Rate Schedule R is based upon a customer's highest demand during the month, while Rate Schedule TOU-R is based upon a customer's highest demand during a specified "peak" period.[1] The Cities, along with the cities of Anaheim, Banning, and Azusa, filed a joint protest and petition to intervene in Edison's rate case. Another wholesale customer, the city of Vernon, also intervened in protest to Edison's application.
 
 
 4
 On March 15, 1979, the Commission accepted Edison's rates for filing and suspended the proposed rate increase for five months pending an evidentiary hearing on the lawfulness of the proposed rates. Hearings on Edison's application were held between May 13 and November 6, 1980.
 
 
 5
 During the proceedings before the administrative law judge ("ALJ"), opposing positions on rate design were presented. The city of Vernon sought the creation of two separate wholesale classes based on load diversity, while the Cities argued that no such diversity existed and that Edison should design rates for only one class. In his November 6, 1981 Initial Decision, the ALJ adopted a rate design, which had not been urged by any party, and ordered Edison to design a Schedule TOU-R demand rate and a Schedule R demand rate for each individual customer; the customer would then select the rate that best suited its load characteristics.
 
 
 6
 On September 10, 1982, the Commission issued Opinion No. 145, reversing the ALJ's decision on rate design and adopted the rate design proposed by Edison. The Commission noted that there was no evidence in the record to support the ALJ's decision to establish a rate for each wholesale customer, and rejected Vernon's proposed design, finding it "interesting," but not "sufficiently fleshed out to merit its adoption." The Commission concluded as follows:
 
 
 7
 Any proposal that would establish more than one customer class should reflect the customer's relative status concerning diversity, the voltage level each customer is served under and the customer's load factors. These are factors we found important in El Paso Electric Co., supra, in adopting separate rate classes for wholesale customers.
 
 
 8
 We reverse the judge. In Opinion No. 62, supra, the Commission ordered Edison to use rates containing one customer class. No party proposing a change from a unitary customer class has provided us with a persuasive alternative. We adopt Edison's filed one-class rate design. Finally, we direct Edison to demonstrate in its compliance filing that its rate design produces the same approximate earned rate of return for each customer.
 
 
 9
 Opinion No. 145. 20 FERC p 61,301, 61,594 (CCH) (1982); (emphasis added).
 
 
 10
 Rehearing of Opinion No. 145 was sought by the Cities, Edison, and Vernon. The Commission denied rehearing, and attempted to clarify its holding regarding rate design.
 
 
 11
 Both Edison and Cities request that we clarify the Rate Design portion of our Opinion. Our holding on that issue was that we generally adopted the rate design proposed by Edison in its filing, including R and TOU-R rate schedules. As to the language requiring a compliance filing that produced the same approximate earned rate of return for each customer, our intention was that this statement was a general directive, not necessarily requiring any drastic changes in the filed rate design. However, if any specific problems arise concerning the rate design that is eventually filed, they will be addressed in the compliance process.
 
 
 12
 Opinion No. 145-A. 21 FERC p 61,211, 61,475 (CCH) (1982) (emphasis added).
 
 
 13
 On March 18, 1983, Edison submitted its compliance filing, which contained revised rates intended to comply with the Commission's directives contained in Opinion Nos. 145 and 145-A (the "First Compliance Filing"). Two alternatives were submitted: Alternative A placed all wholesale customers--Rate Schedule R customers--in a single wholesale class. Alternative B divided the wholesale customers into two groups--Rate Schedule R and Rate Schedule TOU-R customers. Although both Alternative A and Alternative B produced the overall test year rate of return of 10.09%, there were variations in the rates of return Edison would earn from individual customers.
 
 
 14
 The Commission rejected both alternatives in its "Order Rejecting Compliance Filing," issued November 30, 1983, 25 FERC p 61,324 (CCH) (1983), holding that neither alternative complied with its earlier directive that Edison demonstrate that its rate design produces the same approximate earned rate of return from each customer.
 
 
 15
 In its proposed compliance filing, Edison submitted alternative A & B rate designs. We find neither alternative A nor B to be in compliance with Opinion Nos. 145 and 145-A. In those Opinions, we directed Edison "to demonstrate in its compliance filing that its rate design produces the same approximate earned rate of return for each customer." The instant proposed compliance filing contains earned return disparities of 2.47% in alternative A and 2.21% in alternative B. Such disparities exceed the limits of a reasonable range of earned returns among customers. Therefore, we order Edison to file revised alternative B rates which divide the seven R customers into groups in order to produce earned rates of return as close as practicable to the 10.09% overall rate of return we found appropriate in Opinion Nos. 145 and 145-A. Such a filing should eliminate any unreasonable earned return disparities between customers.
 
 
 16
 Id. at 61,734 (footnotes omitted; emphasis added). The Commission indicated that Alternative B was selected as the starting point because "it already breaks the R and TOU-R customers into groups that produce earned returns of 10.09%." Id. at n. 4. The Commission also directed Edison to the Commission's decision in Alabama Power Company, Opinion No. 54-A, 23 FERC p 61,392 (CCH) (1983), "for guidance as to [the Commission's] views regarding reasonable earned return disparities." Id. at n. 6.
 
 
 17
 The Cities sought rehearing of the Commission's rejection order, contending that the Commission improperly reversed Opinion No. 145 by requiring that wholesale customers be divided into several classes. The Cities' petition was denied on January 30, 1984. Thereafter, Riverside and Colton filed petitions for review of the rejection order with this court.
 
 
 18
 On December 23, 1983, Edison submitted to the Commission a revised compliance filing ("Second Compliance Filing"). The Second Compliance Filing was withdrawn prior to the Commission's consideration and a revised second filing was submitted on April 11, 1984 ("Revised Second Compliance Filing"). The Revised Second Compliance Filing grouped the Rate Schedule R customers into three classes and minimized the variation in rates of return earned from each of these customers to .26%.
 
 
 19
 The city of Anaheim and the city of Vernon filed comments in support of the Revised Second Compliance Filing. The Cities also filed their comments, urging the Commission to return to the single-class rate design purportedly adopted in Opinion Nos. 145 and 145-A.
 
 
 20
 On July 20, 1984, the Commission issued its "Letter Order" accepting Edison's Revised Second Compliance Filing. 28 FERC p 61,206 (CCH) (1984). The Cities sought rehearing, which was denied by the Commission on August 22, 1984. Thereafter, the Cities filed a joint petition for review, which was subsequently consolidated with the individual petitions for review previously filed.
 
 STANDARD OF REVIEW
 
 21
 The court has an essentially narrow and circumscribed role in reviewing Commission orders. "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. Sec. 825l (b) (1982). See also Nevada Power Company v. Federal Power Commission, 589 F.2d 1002, 1006 (9th Cir.1979). The court must ensure that the Commission has complied with federal law pertaining to rate making, including section 205(a) of the Act, 16 U.S.C. Sec. 824d(a), proscribing rates that are not just and reasonable, and section 205(b) of the Act, 16 U.S.C. Sec. 824d(b) (1982), forbidding rates or classifications that are preferential or discriminatory. Beyond this, the court must only be satisfied that the Commission's order, viewed in its entirety, produces " 'no arbitrary result.' " Id. at 1006 (quoting Permian Basin Area Rate Cases, 390 U.S. 747, 790, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968)). In reviewing a Commission order, the court has three responsibilities.
 
 
 22
 First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests.... The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.
 
 
 23
 Id. at 1006 (quoting Permian Basin, 390 U.S. at 791-92, 88 S.Ct. at 1372-73).
 
 DISCUSSION
 
 24
 Administrative orders are not final and reviewable " 'unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.' " Air California v. United States Department of Transportation, 654 F.2d 616, 621 (9th Cir.1981) (quoting Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 112-13, 68 S.Ct. 431, 436-37, 92 L.Ed. 568 (1948)); Nevada Airlines, Inc. v. Bond, 622 F.2d 1017, 1020 n. 5 (9th Cir.1980). The Cities' petition for judicial review of the Commission's rejection order is an interlocutory appeal; the rejection order imposed no obligation on the Cities and did not fix any legal relationships. The letter order accepting Edison's Revised Second Compliance Filing, of which the Cities seek judicial review, is the final order of the Commission. It was only upon issuance of the letter order that the rights of the Cities were impacted and obligations fixed.
 
 
 25
 For purposes of judicial review, the rejection order and the letter order are reviewed as one. The Cities' objections to the Commission's ultimate decision raise issues that are so inextricably linked to the rejection order that those issues and the rejection order must be addressed when reviewing the letter order.
 
 
 26
 The Commission's decisions to reject the First Compliance Filing and to order and thereafter approve a multi-class rate design were prompted by Edison's failure to propose a single-class rate design that equalized the rates of return earned from the wholesale customers. The significance of approximately equal earned rates of return in utility rate-making proceedings was recognized in Alabama Electric Cooperative, Inc. v. FERC, 684 F.2d 20, 29-30 (D.C.Cir.1982). In Alabama Electric, a single wholesale rate applicable to both customer classes of the utility--rural cooperatives and municipalities--was approved by the Commission notwithstanding the fact that the utility's compliance filing revealed a .45% disparity in the rates of return earned by the company from these customers. Id. at 24. In their petition for rehearing, the rural cooperatives argued that the rate design was unduly discriminatory and sought either a redesigned single rate or separate customer classes. The Commission denied this request because the disparity issue was not raised prior to the compliance date of the proceeding. On appeal, the D.C. Circuit reversed, holding that "issues related to the conformity of a rate design with the applicable statutory standards may be raised properly within a reasonable time of whenever they present themselves." Id. at 26.
 
 
 27
 As to the discrimination challenge, the D.C. Circuit ruled that a rate design yielding a .45% difference in rate of return is discriminatory, and remanded the proceeding to the Commission for the utility to demonstrate that this discrimination is not undue. Id. at 28-29. The D.C. Circuit's reasoning is instructive.
 
 
 28
 While neither statutes nor decisions of this court require that the Commission utilize a particular formula or a combination of formulae to determine whether rates are just and reasonable, it has come to be well established that electrical rates should be based on the costs of providing service to the utility's customers, plus a just and fair return on equity. FERC itself has stated that "[i]t has been this Commission's long standing policy that rates must be cost supported. Properly designed rates should produce revenues from each class of customers which match, as closely as practicable, the costs to serve each class or individual customer."
 
 
 29
 Id. at 27 (footnote omitted; emphasis in original).
 
 
 30
 We agree with the D.C. Circuit that not only must the revenues from each class of customers match the costs of service, but "[a]ny return disparity created by a rate scheme must therefore be as close to zero as the circumstances permit." Id. at 28-29. Guided by these dual principles, the Commission was not arbitrary or capricious in ordering and approving a multi-class rate design applicable to Edison's wholesale customers.
 
 
 31
 Further, the Commission did not, as the Cities contend, reverse its prior decision in ordering and accepting a multi-class rate design. While Edison's wholesale customers apparently shared several similar service characteristics, one glaring dissimilarity among the customers became apparent at the compliance filing stage of the proceedings: the single-class rate design yielded a significant difference in the rate of return from each wholesale customer. As noted by the D.C. Circuit,
 
 
 32
 It matters little that the affected customer groups may be in most respects similarly situated--that is, that they may require similar types of service at similar (even if varying) voltage levels. If the costs of providing service to one group are different from the costs of serving the other, the two groups are in one important respect quite dissimilar.
 
 
 33
 Alabama Electric, 684 F.2d at 27.
 
 
 34
 Contrary to the Cities' contention, the Commission adequately explained the basis for ordering and approving a multi-class rate design. The Commission's rationale on the rate design issue is readily discernable from its opinions and decisions entered in the course of the rate proceedings. Throughout its decision-making process, the Commission repeatedly emphasized its goal of a rate design that produced the same approximate earned rate of return from each wholesale customer. The Commission's final order is sufficiently clear so that we are not required to speculate as to its basis. See Lodi Truck Service, Inc. v. United States, 706 F.2d 898, 901 (9th Cir.1983).
 
 
 35
 In addition, the Commission's decision is founded on substantial evidence. The determinative set of facts did not become available until the submission of the First Compliance Filing, which produced significant disparities in the rates of return from each of the wholesale customers. The city of Vernon, another wholesale customer of Edison and an intervenor in the rate proceeding, objected to the single-class rate design, noting that it would be required to pay annual charges that exceeded by $1,600,000 Edison's revenue requirement from Vernon during the two-year locked-in period. A primary beneficiary of this subsidization by Vernon would have been the city of Riverside. The significant disparity justifies the Commission's decision to order and thereafter approve a multi-class rate design.
 
 
 36
 The Commission's order is AFFIRMED.
 
 
 
 [1]
 The goal of a utility in offering TOU-R rates is to reduce the on-peak system demand. The rate should be designed so that each individual customer has an incentive to reduce demand during on-peak hours. "On-peak" hours for purposes of Edison's application were defined as weekdays from 1:00 p.m. to 7:00 p.m. commencing at 12:01 a.m. May 1 and continuing through October 31 of each year, and weekdays from 5:00 p.m. to 10:00 p.m. commencing at 12:01 a.m. November 1 and continuing through April 30 of the following year